On July 1, 1996, the appellant, Larry Wayne Whitehead, was convicted of three counts of capital murder in connection with the murder of Ernest Andrew Whitten. The murder was made capital because the appellant committed it during the course of a first-degree burglary, see § 13A-5-40(a)(4), Ala. Code 1975; because Whitten had testified before a grand jury that had indicted the appellant for first-degree theft of property, see § 13A-5-40(a)(14), Ala. Code 1975; and because Whitten had been subpoenaed to testify at the appellant's trial on the theft charge, see §13A-5-40(a)(14), Ala. Code 1975. By a vote of 12-0, the jury recommended that the appellant be sentenced to death. On August 16, 1996, the trial court accepted the jury's recommendation and sentenced the appellant to death.
This court affirmed the appellant's convictions and sentences,see Whitehead v. State, 777 So.2d 781
(Ala.Crim.App. 1999); the Alabama Supreme Court affirmed his convictions and sentences, see Ex parte Whitehead,777 So.2d 854 (Ala. 2000); and the United States Supreme Court denied his petition for certiorari review, see Whitehead v.Alabama, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142
(2001). This court issued a certificate of judgment on September 20, 2000. *Page 450 
On February 27, 2002, the appellant filed a Rule 32 petition, challenging his convictions. After the State responded, the circuit court summarily denied the petition. This appeal followed.
The appellant raises several arguments, including allegations that his attorney rendered ineffective assistance during the guilt and penalty phases of his trial.
 "To prevail on a claim of ineffective assistance of counsel, the defendant must show (1) that his counsel's performance was deficient and (2) that he was prejudiced as a result of the deficient performance. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).
 "`The appellant must show that his counsel's performance was unreasonable, considering all of the attendant circumstances. . . . "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." Strickland, 466 U.S. at 690, 104 S.Ct. at 2066.'
 "Duren v. State, 590 So.2d 360, 362
(Ala.Cr.App. 1990), aff'd, 590 So.2d 369 (Ala. 1991), cert. denied, [503] U.S. [974], 112 S.Ct. 1594, 118 L.Ed.2d 310 (1992).
 "When this court is reviewing a claim of ineffective assistance of counsel, we indulge a strong presumption that counsel's conduct was appropriate and reasonable. Luke v. State, 484 So.2d 531, 534
(Ala.Cr.App. 1985). The burden is on the appellant to show that his counsel's conduct was deficient. Luke.
 "`Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.'
 "Strickland, 466 U.S. at 689, 104 S.Ct. at 2065-66. (Citations omitted.) Ex parte Lawley, 512 So.2d 1370, 1372 ([Ala.] 1987).
 "Initially we must determine whether counsel's performance was deficient. We must evaluate whether the action or inaction of counsel of which the petitioner complains was a strategic choice. `Strategic choices made after a thorough investigation of relevant law and facts are virtually unchallengeable. . . .' Lawley, 512 So.2d at 1372. This court must avoid using `hindsight' to evaluate the performance of counsel. We must evaluate all the circumstances surrounding the case at the time of counsel's actions before determining whether counsel rendered ineffective assistance. Falkner v. State, 586 So.2d 39 (Ala.Cr.App. 1991)."
Hallford v. State, 629 So.2d 6, 8-9 (Ala.Crim.App. 1992). *Page 451 
 "In determining whether a defendant has established his burden of showing that his counsel was ineffective, we are not required to address both considerations of the Strickland v. Washington test if the defendant makes an insufficient showing on one of the prongs. Id. at 697, 104 S.Ct. at 2069. In fact, the Court explained that `[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.' Id. We defer to this guidance and address the `prejudice' prong, for `[w]ith respect to the prejudice component, the lack of merit of [Thomas's] claim is even more stark.' Id. at 699, 104 S.Ct. at 2070."
Thomas v. State, 511 So.2d 248, 255
(Ala.Crim.App. 1987) (footnote omitted).
On direct appeal, this court summarized the relevant facts of the case as follows:
 "The evidence presented at trial tended to show the following. Whitehead was an employee at Hudson Foods, Inc. He had been punching his time card when he arrived at work, leaving immediately thereafter, and then returning to work and punching the time card to indicate he had worked a full day. Whitehead's codefendants, James Matthew Hyde and Stephen Brookshire, had, on several occasions, helped Whitehead with his scheme to be paid without actually working, by punching Whitehead's time card for him, thus clocking him in and out of work. Hudson Foods eventually became aware of Whitehead's scheme, and Detective Andrew Whitten of the Albertville Police Department was assigned to investigate Whitehead and the theft allegations Hudson Foods had made against him. Whitten interviewed Whitehead concerning the theft allegations, and he was eventually arrested and charged with theft of property in the first degree. Specifically, he was charged with stealing approximately $12,000 from Hudson Foods.
 "At the time of his arrest, Whitehead was on parole for a prior felony conviction. A parole revocation hearing was held, and Whitten testified at that hearing concerning his investigation of the Hudson Foods theft case. Upon conclusion of the hearing, however, Whitehead's parole was not revoked. Approximately one month later, in September 1994, Whitehead was indicted for theft of property in the first degree. Whitten testified before the grand jury that indicted Whitehead concerning his investigation of the theft charges. Whitten was also subpoenaed to testify at Whitehead's trial, which was set to begin on January 30, 1995. Whitten was shot on January 24, 1995, and on January 25, 1995, he died from injuries he sustained in the shooting.
 "Whitehead's codefendant Stephen Brookshire testified that Whitehead approached him on the morning of January 24, 1995, and asked him if he would `drive for him' later that night, telling Brookshire that he had to `get rid of his witness.' (R. 1403.) Brookshire knew that Whitehead had been charged with theft. In fact, Brookshire testified at Whitehead's parole revocation hearing to the effect that he had clocked Whitehead in and out of work on several occasions.
 "According to Brookshire, Whitehead and Hyde came to his mobile home on the evening of January 24, 1995, and at approximately 9:00 p.m. that night, the three men left in an automobile, with Brookshire driving. Brookshire testified that they drove to Whitten's neighborhood, and he parked the car near Whitten's house and turned off the headlights. Brookshire further testified *Page 452 
that Hyde got out of the car and that Whitehead told him, `Don't mess up.' (R. 1416.) Brookshire stated that Hyde had been gone for several minutes when he heard a single gunshot. According to Brookshire, Hyde came running back to the car, jumped in, and repeatedly told Whitehead that he was `sorry' because Whitten was not dead. Brookshire stated that Hyde told Whitehead that he was able to shoot Whitten only once because, after the first shot, his gun had jammed. Brookshire testified that Whitehead told Hyde it was okay, `we'll get him later.' (R. 1419.) Brookshire stated that he knew when they left his mobile home that night that they were going to `get rid of Whitehead's witness; however, he stated that he did not know the identity of the witness.
 "Numerous witnesses for the State testified that Whitehead talked frequently about filing a multimillion-dollar civil lawsuit against Hudson Foods for making false allegations of theft against him. On numerous occasions, Whitehead was heard by these witnesses saying that Whitten was the only witness in the theft case and that if Whitten was `out of the way,' he would be acquitted and he could win the civil lawsuit. Wanda Self, Whitehead's girlfriend, with whom he was living at the time of the murder, testified that shortly after the murder, Whitehead told her that `the deed was done.' (R. 1136.) There was further testimony that Whitehead had said, with regard to his upcoming trial on the theft charges, that he would `shoot up the courtroom with Andy Whitten in it.' (R. 1278.)
 "There was also testimony from one of Whitten's neighbors that, several days before the murder, a man knocked on his door wanting to know where Whitten lived. Wanda Self and her daughter both testified that they were with Whitehead several days before the murder when he was looking for Whitten's house and knocked on the door of a house near Whitten's to find out where Whitten lived.
 "Randall Ogle testified that on January 25, 1995, Whitehead asked him to get rid of a .380 caliber semiautomatic pistol, the same type of weapon used to kill Whitten. Ogle stated that he threw the gun in a river. The police were unable to find the gun.
 "Also, several witnesses who saw Hyde shortly before he left with Whitehead and Brookshire on the evening Whitten was killed testified that Hyde was wearing a blue sweatshirt-type jacket and baseball cap on that night. Further testimony revealed that shortly after the murder, on the same night, Hyde was seen putting a blue sweatshirt-type jacket and a baseball cap into a white plastic bag; the jacket and the cap had been torn into pieces. The testimony revealed that Hyde threw the plastic bag into a river. The police found that plastic bag containing the items of clothing on the day after Whitten's murder.
 "Whitehead did not testify at his trial; however, his testimony from Hyde's trial was read into evidence at his trial. At Hyde's trial, Whitehead testified that he, and not Hyde, had killed Whitten. Whitehead stated that when they went to Whitten's house on the night of the shooting, Hyde and Brookshire thought that they were going to a drug dealer's house to buy drugs. After the State rested its case, the defense called no witnesses."
Whitehead, 777 So.2d at 794-96.
 I.
The appellant argues that the circuit court improperly rejected the following allegations by concluding that a finding *Page 453 
of no plain error on direct appeal foreclosed a finding ofStrickland prejudice in a Rule 32 petition:
 1) trial counsel rendered ineffective assistance because he did not renew his motion for a change of venue;
 2) trial counsel rendered ineffective assistance because he did not conduct an adequate voir dire examination of prospective jurors;
 3) trial counsel rendered ineffective assistance because he did not object to the State's alleged use of peremptory challenges to discriminate based on gender;
 4) trial counsel rendered ineffective assistance because he did not request jury instructions on manslaughter;
 5) trial counsel rendered ineffective assistance because he did not request jury instructions on intentional murder;
 6) trial counsel's cumulative errors during the guilt phase of the trial deprived him of the effective assistance of counsel;
 7) trial counsel rendered ineffective assistance due, in part, to inadequate compensation;
 8) trial counsel rendered ineffective assistance because he did not object to the State's allegedly impermissible use of victim impact evidence during the penalty phase of the trial; and
 9) trial counsel's cumulative errors during the penalty phase of the trial deprived him of the effective assistance of counsel.
In Ex parte Taylor, [Ms. 1040186, September 30, 2005] ___ So.2d ___, ___ (Ala. 2005), the Alabama Supreme Court stated:
 "[W]e granted certiorari review only with respect to the issue whether a determination on direct appeal that there was no plain error in the trial proceedings necessarily forecloses a determination of the prejudice required under Strickland v. Washington for a claim of ineffective assistance of counsel raised in a postconviction proceeding. This Court holds that it does not. . . .
 ". . . .
 "The Court of Criminal Appeals' opinion erroneously concludes that a finding of no plain error on direct appeal automatically precludes a capital defendant from raising a claim of ineffective assistance of counsel in a postconviction proceeding.
 ". . . .
 "Although it may be the rare case in which the application of the plain-error test and the prejudice prong of the Strickland test will result in different outcomes, a determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under Strickland to sustain a claim of ineffective assistance of counsel. In determining whether to grant a Rule 32 petitioner relief on an ineffective-assistance claim, a court must examine both the plain-error and prejudice standards of review."
Thus, the circuit court erroneously concluded that a finding of no plain error on direct appeal foreclosed a finding ofStrickland prejudice in a Rule 32 ineffective-assistance-of-counsel claim.[1] *Page 454 
We note that the circuit court entered its order on July 15, 2005, which was before the Alabama Supreme Court decided Exparte Taylor. Therefore, neither the State nor the circuit court has had an opportunity to address the appellant's allegations by applying the prejudice prong of theStrickland test, as is required by Ex parteTaylor. Accordingly, we remand this case to the circuit court for that court to address the above-referenced ineffective-assistance allegations in light of the Alabama Supreme Court's decision in Ex parte Taylor.[2]
 II.
The appellant also argues that the circuit court erroneously relied on his purported waiver of a mitigation presentation at trial as a ground to deny him an evidentiary hearing on his allegations that his counsel rendered ineffective assistance during the penalty phase of his trial by not investigating aggravating and mitigating circumstances, not arguing on his behalf before the jury and the trial court, and not objecting to improper evidence and argument. Contrary to the State's argument in brief, the appellant specifically challenged the validity of his waiver and counsel's performance in relation to that waiver during a status conference and in his "Petitioner's Opposition to Respondent's Motion to Dismiss Petitioner's Rule 32 Petition."
Initially, we note that we have held "that a competent defendant can waive the presentation of mitigating evidence at a capital sentencing proceeding, provided the trial court carefully weighs possible statutory and nonstatutory mitigating circumstances against the aggravating circumstances to assure that death is the appropriate sentence." Nelson v.State, 681 So.2d 252, 255 (Ala.Crim.App. 1995). Also, inAdkins v. State, 930 So.2d 524, 536
(Ala.Crim.App. 2004) (opinion on return to third remand), we stated:
 "Adkins first argues that he was denied the effective assistance of counsel at the penalty phase of his capital trial, because, he says, his attorneys failed to investigate and present mitigating evidence and failed to make an effective closing argument.
 ". . . .
 "The question here is whether a defendant's waiver of the presentation of mitigation evidence at the penalty phase of a capital-murder trial bars that defendant from arguing that his counsel's performance was deficient for failing to present mitigating evidence. Though Alabama has not specifically addressed this issue, we have looked to other states for guidance. In Zagorski v. State, 983 S.W.2d 654
(Tenn. 1998), the Tennessee Supreme Court addressed a similar issue. The Zagorski court stated:
 "`The petitioner contends that his trial attorneys were ineffective in failing to investigate and present mitigating evidence despite his instructions to the contrary. Generally, a defense attorney's failure to investigate and prepare for a possible capital sentencing hearing is below the range of competence demanded of criminal attorneys. *Page 455 See California v. Brown, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987); Goad [v. State], 938 S.W.2d [363] at 369
[(Tenn. 1996)]. . . .
 "`In this case, petitioner's counsel recognized the importance of exploring and presenting mitigating evidence. They yielded, however, to the petitioner's demands that no evidence be offered in mitigation upon his conviction of first degree murder. The petitioner understood that he faced the death penalty, but he nevertheless instructed his attorneys to refrain from any investigation into his family background and to essentially forego any defense at the sentencing phase.
 "`. . . .
 "`When a competent defendant knowingly and voluntarily chooses a lawful course of action or defense strategy, counsel is essentially bound by that decision. If the defendant is prejudiced in some respect by his own decision, he should not later be heard to complain about those consequences by challenging the conduct of his counsel. See State v. Dunn, 224 Tenn. 255, 453 S.W.2d 777, 779
(Tenn. 1970); Dukes v. State, 578 S.W.2d 659, 665 (Tenn.Crim.App. 1978).'
 "983 S.W.2d at 657-59 (footnote omitted).
 "In State v. Arguelles, 63 P.3d 731 (Utah 2003), the Utah Supreme Court stated:
 "`Some courts have held that in capital cases the Eighth Amendment requires admission of all available mitigating evidence to ensure the reliability of the death verdict, regardless of whether the defendant approves of having such evidence presented. See State v. Koedatich, 112 N.J. 225, 548 A.2d 939, 992-97 (1988); see also Morrison v. State, 258 Ga. 683, 373 S.E.2d 506, 509 (1988) (stating that where defendant refuses to offer mitigating evidence, the trial court "may" have an obligation to conduct an independent investigation into evidence of mitigation). The vast majority of courts considering this issue, however, have reached the opposite conclusion, determining that a defendant's Sixth Amendment right to represent himself and control the course of the proceedings carries with it the right to choose how much — if any — mitigating evidence is offered. See, e.g., United States v. Davis, 285 F.3d 378, 381-85 (5th Cir.2002) (overturning district court's decision to appoint independent counsel to present mitigating evidence defendant refused to present); Singleton v. Lockhart, 962 F.2d 1315, 1322 (8th Cir.1992) (finding no ineffective assistance of counsel where counsel complied with client's demand to present no mitigating evidence); Silagy v. Peters, 905 F.2d 986, 1008 (7th Cir.1990) (stating a capital defendant may forego the presentation of mitigating evidence); Nelson v. State, 681 So.2d 252, 255-56 (Ala.Crim.App. 1995) (stating capital defendant may waive the presentation of mitigating evidence); People v. Bloom, 48 Cal.3d 1194, 259 Cal.Rptr. 669, 774 P.2d 698, 718-19 (1989) (upholding death verdict where self-represented defendant chose to present no mitigating evidence); Hamblen v. State, 527 So.2d 800, 804 (Fla. 1988) (upholding death verdict where self-represented defendant did not oppose death verdict and chose to present no mitigating evidence); State v. Coleman, 168 Ill.2d 509, 214 Ill.Dec. 212, 660 N.E.2d 919, 933 *Page 456 
(1995) (upholding death verdict where self-represented defendant chose to present no mitigating evidence); State v. Ashworth, 85 Ohio St.3d 56, 706 N.E.2d 1231, 1236-39 (1999) (upholding death verdict where defendant chose to present no mitigating evidence); Wallace v. State, 893 P.2d 504, 511-12 (Okla.Crim.App. 1995) (upholding death verdict where defendant openly sought death penalty and chose to present no mitigating evidence); Zagorski v. State, 983 S.W.2d 654, 657-59 (Tenn. 1998) (finding no ineffective assistance of counsel where counsel complied with client's demand to present no mitigating evidence). We agree with the reasoning of these courts.'
 "63 P.3d at 752-53. See also People v. Orange, 168 Ill.2d 138, 169, 659 N.E.2d 935, 949, 213 Ill.Dec. 589, 603 (1995) (`Where a capital defendant waives presentation of mitigating evidence, counsel's compliance with his client's wishes does not support a claim of ineffective assistance of counsel.'); Frye v. Lee, 235 F.3d 897, 906-07
(4th Cir.2000) (`Were we to hold that [counsel] and [cocounsel] rendered ineffective assistance, despite their repeated attempts to have [the defendant] change his mind on presenting mitigation evidence, we would be forcing defense lawyers in future cases to choose between Scylla and Charybdis.'); Battenfield v. State, 953 P.2d 1123, 1127 (Okla.Crim.App. 1998) (`We will not hold counsel responsible for a client's obstinate behavior.').
 "We join the majority of jurisdictions that have considered this issue and hold that a defendant is estopped from raising a claim of ineffective assistance of counsel for counsel's failure to present mitigating evidence when the defendant waived the presentation of mitigating evidence.
 "To punish Adkins's attorneys for following his wishes would conflict with the doctrine of invited error. `Under the doctrine of invited error, a defendant cannot by his own voluntary conduct invite error and then seek to profit thereby.' Phillips v. State, 527 So.2d 154, 156 (Ala. 1988).
 "Ultimately the decision to waive the presentation of mitigating evidence was Adkins's decision. We refuse to find an attorney's performance ineffective for following his client's wishes.
 "`To require defense counsel to present mitigating evidence over the defendant's objection would be inconsistent with an attorney's paramount duty of loyalty to the client and would undermine the trust, essential for effective representation, existing between attorney and client. Moreover, imposing such a duty could cause some defendants who otherwise would not have done so to exercise their Sixth Amendment right of self-representation.'
 "People v. Lang, 49 Cal.3d 991, 1031, 782 P.2d 627, 653, 264 Cal.Rptr. 386, 412 (1989).
 "The record also shows that counsel did investigate possible mitigating evidence. Adkins's parents were deceased, but defense counsel contacted other family members. Adkins's half-brother said, `To hell with him. He got what he deserved.' Adkins's sister could not miss work and was unable to attend the trial. Adkins's girlfriend could not attend because of the expense. [Counsel] testified that Adkins's family members were angry with him. Also, [cocounsel] testified that he and [counsel] intended to present the testimony of a psychologist and Adkins's probation officer at the *Page 457 
penalty phase. There is absolutely not evidence indicating that counsel's performance was outside the wide range of acceptable conduct. See Strickland."
(Footnotes omitted.)
This case is distinguishable from Adkins. InAdkins, as we noted, the record showed that counsel investigated possible mitigating evidence. In contrast, the record in this case does not show whether counsel conducted an investigation for possible mitigating evidence. Also, inAdkins, the appellant did not specifically challenge the validity of his waiver of the presentation of mitigation and counsel's performance in relation to that waiver. In contrast, the appellant in this case does. In Boglin v. State,840 So.2d 926, 928-31 (Ala.Crim.App. 2002), with regard to waivers of the right to appeal and to seek post-conviction review in the context of guilty pleas, we stated:
 "Boglin filed the present Rule 32 petition attacking his conviction.
 "In his petition, Boglin presented a laundry list of claims, including claims that his guilty plea was involuntary, that his waiver of his right to appeal and his right to collaterally attack his conviction was involuntary, and that his trial counsel was ineffective. After receiving a response from the State, the circuit court summarily denied Boglin's petition. In its order, the circuit court found that the majority of Boglin's claims — including his claims that his guilty plea and waiver were involuntary and that his trial counsel was ineffective — had been waived by Boglin's plea agreement.
 "It is well settled that a defendant may, as part of a negotiated plea agreement, agree to waive his right to appeal `so long as he is fully advised of its implications and he voluntarily agrees to enter into the agreement.' Watkins v. State, 659 So.2d 688, 689 (Ala.Crim.App. 1994). See also Dunn v. State, 514 So.2d 1300 (Ala. 1987); Watson v. State, 808 So.2d 77 (Ala.Crim.App. 2001); Jones v. State, 675 So.2d 69
(Ala.Crim.App. 1995); and Gwin v. State, 456 So.2d 845 (Ala.Crim.App. 1984). `[A] colloquy with the defendant that reflects that he or she was informed of the right to appeal and that he or she chose to waive this right is sufficient to show a valid and enforceable waiver.' Watson, 808 So.2d at 80. In addition, just like a challenge to the voluntariness of a guilty plea, the issue of the voluntariness of a waiver of the right to appeal will be reviewed on direct appeal if it is first presented to the trial court.
 "The reasoning behind permitting a defendant to challenge on direct appeal the voluntariness of a waiver of the right to appeal if that issue is properly preserved in the trial court is clear: an agreement that purports to waive a right may be enforced only if that waiver is voluntarily and knowingly entered. Because a waiver must be voluntary, due process requires that a defendant have the opportunity to challenge the voluntariness of that waiver. Due process does not override the basic law of preservation, however, and the issue must first be presented to the trial court before it will be reviewed on direct appeal. Moreover, because a waiver of the right to appeal is part and parcel of the guilty plea itself, an involuntary guilty plea will render the waiver involuntary as well. Therefore, an accused may likewise challenge the voluntariness of the guilty plea on direct appeal if that issue is properly preserved, despite the presence of a waiver.
 "The question in this case is whether the voluntariness of a guilty plea and the voluntariness of a waiver of the right to *Page 458 
appeal and to collaterally attack a conviction may be raised for the first time in a Rule 32 petition, despite the presence of the waiver purporting to bar collateral review. We believe the same reasoning this Court has used in deciding to review voluntariness issues on direct appeal should likewise be applied to voluntariness issues raised for the first time in Rule 32 petitions.
 "The Alabama Supreme Court has held that the voluntariness of a guilty plea may be raised for the first time in a Rule 32 petition. See Cantu v. State, 660 So.2d 1026 (Ala. 1994). The presence of a waiver of the right to collateral review should not bar review of the voluntariness of a guilty plea because, as noted above, an involuntary guilty plea will necessarily render the waiver involuntary and a waiver cannot be enforced if it is not voluntary. For this same reason, the voluntariness of the waiver itself may also be reviewed in a Rule 32 petition. In addition, because ineffective assistance of counsel may, in some circumstances, render a guilty plea involuntary, see Ex parte Blackmon, 734 So.2d 995 (Ala. 1999), we believe that claims of ineffective assistance of trial counsel may also be raised in a Rule 32 petition, despite a waiver of collateral review.
 ". . . .
 "We hold that although a waiver of the right to seek postconviction relief given as part of a plea agreement is generally enforceable, it cannot operate to preclude a defendant from filing a Rule 32 petition challenging the voluntariness of the guilty plea, the voluntariness of the waiver, or counsel's effectiveness. Therefore, the circuit court erred in finding that Boglin's claims that his guilty plea was involuntary, that his waiver of his right to appeal and to collaterally attack his conviction was involuntary, and that his trial counsel was ineffective were waived by the plea agreement."
(Footnotes omitted.)
Similarly, for the reasons set forth herein, we hold that, although a waiver of the right to present mitigation evidence is generally enforceable, it cannot operate to preclude a defendant from filing a Rule 32 petition challenging the voluntariness of the waiver or counsel's effectiveness in relation to that waiver. To any extent that our opinion in Adkins held or implied otherwise, it is hereby expressly overruled.
In Battenfield v. Gibson, 236 F.3d 1215, 1226-27 (10th Cir.2001), the United States Court of Appeals for the Tenth Circuit addressed a similar situation as follows:
 "Battenfield contends his trial counsel . . . rendered ineffective assistance during the penalty phase of trial because he failed to adequately prepare or present any mitigating evidence. . . . Although Battenfield acknowledges that he informed [trial counsel] and the trial court prior to the beginning of the penalty phase that he did not want to present any mitigating evidence, he argues that he did not knowingly and intelligently waive his right to present such evidence. . . .
 ". . . .
 ". . . In rejecting Battenfield's ineffective assistance claim, the [Oklahoma Court of Criminal Appeals] relied heavily on Battenfield's alleged waiver of his right to present mitigating evidence. . . .
 ". . . .
 "The overriding question is whether the [Oklahoma Court of Criminal Appeals] reasonably applied Strickland in rejecting Battenfield's ineffective assistance claim. . . . Because the [Oklahoma Court of Criminal Appeals'] decision was *Page 459 
based on the state district court's finding that Battenfield knowingly waived his right to present mitigating evidence, we must examine the propriety of that finding. In performing our analysis, it is necessary to review several factors, including the investigative efforts of defense counsel prior to the beginning of the penalty phase, his penalty phase strategy, the advice he rendered to Battenfield prior to Battenfield's alleged decision to waive the presentation of mitigating evidence, and the trial court's examination of Battenfield regarding his alleged waiver."
More recently, in Thomas v. Beard, 388 F.Supp.2d 489,513-14 (E.D.Pa.2005), the United States District Court for the Eastern District of Pennsylvania discussed a waiver argument that was similar to the State's argument in this case as follows:
 "The Commonwealth argues that any assertable deficiency of defense counsel in investigating possible lines of a mitigation defense at the sentencing phase cannot constitute a cognizable instance of ineffective assistance of counsel for the reason that Thomas directed counsel not to argue in mitigation. Thomas does not deny that he so advised counsel, and the record reflects that Thomas, in colloquy, even expressed such a desire to the trial judge. But while `[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions,' Strickland, 466 U.S. at 691, 104 S.Ct. 2052, not every such waiver is constitutionally valid.
 "As the Supreme Court made plain more than sixty years ago, `[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege. The determination of whether there has been an intelligent waiver . . . must depend, in each case, upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused. Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938). The Court has examined this requirement in several contexts, most notably with respect to a defendant's guilty plea. See, e.g., North Carolina v. Alford, 400 U.S. 25, 31, 91 S.Ct. 160, 27 L.Ed.2d 162 (1970) (`The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'); McCarthy v. United States, 394 U.S. 459, 466, 89 S.Ct. 1166, 22 L.Ed.2d 418 (1969) (waiver in the context of a guilty plea `cannot be truly voluntary unless the defendant possesses an understanding of the law in relation to the facts.'). In its discussion of the waiver of the right to counsel, the Court has used similar language in terms of the knowledge required.
 "`To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter.'
 "Von Moltke v. Gillies, 332 U.S. 708, 724, 68 S.Ct. 316, 92 L.Ed. 309 (1948); see also
Pa. R.Crim. P. 121(c) (requiring a `knowing, voluntary, and intelligent waiver of counsel'). As the Court recently explained, `The purpose of the "knowing and voluntary" inquiry . . . is to determine whether the defendant actually [understands] the significance and consequences of a particular decision[.]' Godinez v. Moran, 509 U.S. 389, 401 n. 12, 113 S.Ct. 2680, 125 L.Ed.2d 321 (1993). *Page 460 
 "Courts have extended this standard to waivers of the right to present mitigating evidence, see, e.g., Wilkins v. Bowersox, 145 F.3d 1006, 1015-1016
(8th Cir.1998), and it is clear that such a waiver cannot be knowingly and intelligently made in the absence of full information about the nature of one's choices. `First, counsel's duty to investigate reasonably and inform and advise his client must be fulfilled before either the lawyer or his client can decide what evidence to present; if counsel failed to investigate and advise, then Petitioner's waiver was not knowing and intelligent and thus without legal effect' Holloway [v. Horn], 161 F.Supp.2d [452,] 569 [(E.D.Pa.2001)] (emphasis added), rev'd on other grounds, 355 F.3d 707 (3d Cir.2004). As the Third Circuit has squarely held, the absence of an informed decision vitiates an otherwise valid waiver. See United States v. Gray, 878 F.2d [702,] 712 [(3d Cir.1982)]. The court in Gray expressly held that a defendant's reluctance to subpoena witnesses could not act as a waiver of his right to have those witnesses testify, as this reluctance was based on inaccurate information — counsel did not know, and therefore failed to inform the defendant, that subpoenaed witnesses were entitled to compensation for their expenses. Id. `This therefore is not a case in which the defendant made an informed decision which precluded counsel from having a duty to pursue a given line of investigation.' Id.
 "Indeed, as several courts have suggested, the failure to investigate itself precludes a knowing waiver, as there will always be uninformed decisions in such cases. See, e.g., Blanco v. Singletary, 943 F.2d 1477, 1500-03 (11th Cir. 1991) (counsel's failure to talk to potential mitigation witnesses and to investigate defendant's mental health status resulted in an unknowing, involuntary waiver, as without knowing what evidence defendant was foregoing, counsel `could not have advised [him] fully as to the consequences of his choice not to put on any mitigation evidence'). A defendant's desire not to present mitigating evidence, therefore, cannot by itself terminate counsel's duty to investigate. Indeed, `[t]he reason lawyers may not "blindly follow" such commands is that although the decision whether to use such evidence is for the client, the lawyer first must evaluate potential avenues and advise the client of those offering potential merit.' Thompson v. Wainwright, 787 F.2d 1447, 1451 (11th Cir.1986). See also Battenfield v. Gibson, 236 F.3d 1215, 1227-35
(10th Cir.2001) (because counsel failed to conduct a reasonable investigation for possible mitigating evidence, he could not competently advise the defendant as to the meaning, nature, and availability of such evidence; therefore, the defendant's waiver was not knowing and intelligent); Coleman v. Mitchell, 268 F.3d 417, 449-50 (6th Cir.2001) (for the refusal to present mitigating mental health evidence to be an informed one, counsel must fulfill its independent obligation to investigate despite a defendant's expressed wishes to the contrary). . . ."
See also Byrom v. State, 927 So.2d 709 (Miss. 2006) (recognizing that a defendant may waive a jury for sentencing purposes if he knowingly and intelligently makes that waiver).
Although waivers of mitigation may be appropriate in certain circumstances, not every waiver of mitigation is constitutionally valid.[3] Therefore, the propriety of *Page 461 
the circuit court's reliance on the appellant's purported waiver in this case must be examined. Before the penalty phase of the appellant's trial started, the following occurred:
 "THE COURT: Thank you, gentlemen. . . . [A]s you all know very well, the defendant may and is authorized to waive jury in the sentencing phase if he wishes. Have you discussed that with —
 "[TRIAL COUNSEL]: Judge, we have discussed it. I don't think Larry has made up his mind yet.
 "([Trial counsel] and defendant confer.)
 "THE COURT: Certainly, I'm not suggesting that.
 "[TRIAL COUNSEL]: Yes, sir, Your Honor. We've discussed it at length. He was deciding over the noon hour.
 "THE COURT: Take your time.
 "[TRIAL COUNSEL]: Your Honor, Mr. Whitehead would waive the sentencing phase of this hearing by the jury.
 "THE COURT: Would the State consent to that?
 "[PROSECUTOR]: Judge —
 "THE COURT: No problem. Either way. *Page 462 
 "[PROSECUTOR]: Okay. We would like jury participation.
 "THE COURT: All right. Very good. I always like to hear the jury's opinion."
(R. 1779-80.)[4] After the trial court instructed the jury regarding the penalty phase and the prosecutor made an opening argument, defense counsel stated, "Your Honor, as the defendant said to the Court, he waives his opportunity and the right to present any type of opening or closing statement on any mitigating circumstances. This was informed of the Court before the State's opening and would continue with that waiver. Thank you." (R. 1788-89.) The State then made its penalty phase presentation.
After the State's penalty phase presentation, the following occurred:
 "[TRIAL COUNSEL]: Nothing for the defendant, Your Honor.
 "THE COURT: Ladies and gentlemen, if you will retire to the jury room just for a few minutes. Don't discuss the case. I'll have you back in in just a few minutes.
 "(Jury leaves courtroom.)
 "THE COURT: Gentlemen, with no defense being offered by the defendant, I think we need to make a record that the defendant has discussed this matter with his attorney and is making an intelligent, knowing decision not to present any evidence at all for the defense. I'm sure [trial counsel] — and knowing you as well as I do know you — that you have done this and have discussed it with Mr. Whitehead. Mr. Whitehead, you do understand, however, and I need to explain to you, that there are matters known as mitigating circumstances; do you understand that?
 "THE DEFENDANT: Yes, sir.
 "THE COURT: You understand you have the right to present evidence to that?
 "THE DEFENDANT: Yes, sir.
 "THE COURT: That you have the right to make any defense that you have to the jury in attempting to contest the aggravating circumstances which they have shown and you have the right to present any mitigating circumstances?
 "THE DEFENDANT: Yes, sir.
 "THE COURT: [Trial counsel], have you discussed this with Mr. Whitehead?
 "[TRIAL COUNSEL]: We have, Your Honor, on more than one occasion this past week. Mr. Whitehead has expressed his desire not to call any witnesses. We discussed family members being called and he has declined to have any of his family to testify for him.
 "THE COURT: Do you have any matter that you would like to present that Mr. Whitehead does not understand the proceeding or understand what he has the right to do?
 "[TRIAL COUNSEL]: No, sir, Your Honor. I think he understands definitely and he's made the decision not to call any family or friends or any witnesses to mitigate under the circumstances?
 "THE COURT: Mr. Whitehead, have you presented or submitted anything to [trial counsel] in defense this case that he has not gone throughout to your satisfaction?
 "THE DEFENDANT: No, sir.
 "THE COURT: Are you totally and completely satisfied with [trial counsel's] advice and services in this matter?
 "THE DEFENDANT: Yes, sir. *Page 463 
 "THE COURT: You are giving up your right to any defense in this sentencing procedure voluntarily, knowing what you are doing?
 "THE DEFENDANT: Yes, sir.
 "THE COURT: All right."
(R. 1808-11.) The prosecutor then made a closing argument. Afterward, defense counsel stated, "Nothing for the defense, Your Honor. The defense waives final argument." (R. 1820.)
 "`In order to obtain a reversal of [a] death sentence on the ground of ineffective assistance of counsel, [an appellant] must show both (1) that the identified acts or omissions of counsel were deficient, or outside the wide range of professionally competent assistance, and (2) that the deficient performance prejudiced the defense such that, without the errors, there is a reasonable probability that the balance of aggravating and mitigating circumstances would have been different. Bolender v. Singletary, 16 F.3d 1547, 1556-57 (11th Cir.) (citing Strickland [v. Washington], 466 U.S. [668] at 687, 104 S.Ct. [2052] at 2064 [(1984)]), cert. denied, [513] U.S. [1022], 115 S.Ct. 589, 130 L.Ed.2d 502 (1994).'
 "Baxter v. Thomas, 45 F.3d 1501, 1512-13
(11th Cir.1995) (emphasis added).
 "Concerning the presentation of mitigating evidence during the penalty phase, the United States Supreme Court in Wiggins v. Smith, 539 U.S. 510, 522-23 (2003), held that the `principal concern in deciding whether [counsel] exercised [the] "reasonable professional judgmen[t],"' required by Strickland, is `whether the investigation supporting counsel's decision not to introduce mitigating evidence of [defendant's] background was itself reasonable.' Wiggins, 539 U.S. at 522-23. . . .
 ". . . .
 "`To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." [Strickland v. Washington, 466 U.S. 668] at 688 [(1984)]. We have declined to articulate specific guidelines for appropriate attorney conduct and instead have emphasized that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." Ibid.'
 "Wiggins v. Smith, 539 U.S. at 532.
 "First we note that `Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation.' Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___, ___ (Ala. 2003).
 "`To determine the appropriate sentence, the sentencer must engage in a "broad inquiry into all relevant mitigating evidence to allow an individualized determination." Buchanan v. Angelone, 522 U.S. 269, 276 (1998). Alabama's sentencing scheme broadly allows the accused to present evidence in mitigation. Jacobs v. State, 361 So.2d 640, 652-53 (Ala. 1978). See § 13A-5-45(g), Ala. Code 1975 ("The defendant shall be allowed to offer any mitigating circumstance defined in Sections 13A-5-51 and 13A-5-52."). "[E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." California v. Brown, 479 U.S. 538, 545 (1987) (O'Connor, J., concurring specially).' *Page 464 
"Ex parte Smith, [Ms. 1010267, March 14, 2003] ___ So.2d ___, ___ (Ala. 2003). . . .
 "Second we note that,
 "`"An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence." Porter v. Singletary, 14 F.3d 554, 557 (11th Cir.), cert. denied, 513 U.S. 1009, 115 S.Ct. 532, 130 L.Ed.2d 435 (1994). The failure to do so "may render counsel's assistance ineffective." Bolender [v. Singletary], 16 F.3d [1547] at 1557 [(11th Cir.1994)].'
 "Baxter v. Thomas, 45 F.3d at 1513."
Harris v. State, 947 So.2d 1079, 1113-15
(Ala.Crim.App. 2004).
 "Although failure to present mitigating evidence during the penalty phase is not per se
ineffective assistance of counsel, counsel has a duty to make a reasonable investigation of defendant's case or to make a reasonable decision that a particular investigation is unnecessary. Ransom v. Johnson, 126 F.3d 716, 723 (5th Cir.1997). . . . If trial counsel's investigation was unreasonable then making a fully informed decision with respect to sentencing strategy was impossible. Wiggins, 539 U.S. at 527-28, 123 S.Ct. 2527."
Smith v. Dretke, 422 F.3d 269, 283-84 (5th Cir.2005).
Also, in Rompilla v. Beard, 545 U.S. 374, 378-93,125 S.Ct. 2456, 2461-69, 162 L.Ed.2d 360 (2005), the United States Supreme Court stated:
 "Rompilla filed claims under the Pennsylvania Post Conviction Relief Act, 42 Pa. Cons.Stat. § 9541 et seq. (2004), including ineffective assistance by trial counsel in failing to present significant mitigating evidence about Rompilla's childhood, mental capacity and health, and alcoholism. The postconviction court found that trial counsel had done enough to investigate the possibilities of a mitigation case, and the Supreme Court of Pennsylvania affirmed the denial of relief. Commonwealth v. Rompilla, 554 Pa. 378, 721 A.2d 786 (1998).
 "Rompilla then petitioned for a writ of habeas corpus under 28 U.S.C. § 2254 in Federal District Court, raising claims that included inadequate representation. The District Court found that the State Supreme Court had unreasonably applied Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), as to the penalty phase of the trial, and granted relief for ineffective assistance of counsel. The court found that in preparing the mitigation case the defense lawyers had failed to investigate `pretty obvious signs' that Rompilla had a troubled childhood and suffered from mental illness and alcoholism, and instead had relied unjustifiably on Rompilla's own description of an unexceptional background. Rompilla v. Horn, No. CIV.A.99-737 (E.D.Pa. July 11, 2000), App. 1307-1308.
 "A divided Third Circuit panel reversed. Rompilla v. Horn, 355 F.3d 233 (2004). The majority found nothing unreasonable in the state court's application of Strickland, given defense counsel's efforts to uncover mitigation material, which included interviewing Rompilla and certain family members, as well as consultation with three mental health experts. Although the majority noted that the lawyers did not unearth the `useful information' to be found in Rompilla's `school, medical, police, and prison records,' it thought the lawyers were justified in failing to hunt through these records when their other efforts gave no reason to believe the search would yield anything helpful. *Page 465 355 F.3d, at 252. The panel thus distinguished Rompilla's case from Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003). Whereas Wiggins's counsel failed to investigate adequately, to the point even of ignoring the leads their limited enquiry yielded, the Court of Appeals saw the Rompilla investigation as going far enough to leave counsel with reason for thinking further efforts would not be a wise use of the limited resources they had. But Judge Sloviter's dissent stressed that trial counsel's failure to obtain relevant records on Rompilla's background was owing to the lawyers' unreasonable reliance on family members and medical experts to tell them what records might be useful. The Third Circuit denied rehearing en banc by a vote of 6 to 5. Rompilla v. Horn, 359 F.3d 310 (2004).
 "We granted certiorari, 542 U.S. 966, 125 S.Ct. 27, 159 L.Ed.2d 857 (2004), and now reverse.
 ". . . .
 "Ineffective assistance under Strickland is deficient performance by counsel resulting in prejudice, 466 U.S., at 687, 104 S.Ct. 2052, with performance being measured against an `objective standard of reasonableness,' id., at 688, 104 S.Ct. 2052, `under prevailing professional norms.' Ibid.; Wiggins v. Smith, supra, at 521, 123 S.Ct. 2527. This case, like some others recently, looks to norms of adequate investigation in preparing for the sentencing phase of a capital trial, when defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation. In judging the defense's investigation, as in applying Strickland generally, hindsight is discounted by pegging adequacy to `counsel's perspective at the time' investigative decisions are made, 466 U.S., at 689, 104 S.Ct. 2052, and by giving a `heavy measure of deference to counsel's judgments,' id., at 691, 104 S.Ct. 2052.
 ". . . .
 "A standard of reasonableness applied as if one stood in counsel's shoes spawns few hard-edged rules, and the merits of a number of counsel's choices in this case are subject to fair debate. This is not a case in which defense counsel simply ignored their obligation to find mitigating evidence, and their workload as busy public defenders did not keep them from making a number of efforts, including interviews with Rompilla and some members of his family, and examinations of reports by three mental health experts who gave opinions at the guilt phase. None of the sources proved particularly helpful.
 "Rompilla's own contributions to any mitigation case were minimal. Counsel found him uninterested in helping, as on their visit to his prison to go over a proposed mitigation strategy, when Rompilla told them he was `bored being here listening' and returned to his cell. App. 668. To questions about childhood and schooling, his answers indicated they had been normal, ibid., save for quitting school in the ninth grade, id., at 677. There were times when Rompilla was even actively obstructive by sending counsel off on false leads. Id., at 663-664.
 "The lawyers also spoke with five members of Rompilla's family (his former wife, two brothers, a sister-in-law, and his son), id., at 494, and counsel testified that they developed a good relationship with the family in the course of their representation. Id., at 669, 729. The state postconviction court found that counsel spoke to the relatives in a `detailed manner,' attempting to unearth mitigating information, id., at 264, although the weight of this finding is qualified *Page 466 
by the lawyers' concession that `the overwhelming response from the family was that they didn't really feel as though they knew him all that well since he had spent the majority of his adult years and some of his childhood years in custody,' id., at 495; see also id., at 669. Defense counsel also said that because the family was `coming from the position that [Rompilla] was innocent . . . they weren't looking for reasons for why he might have done this.' Id., at 494.
 "The third and final source tapped for mitigating material was the cadre of three mental health witnesses who were asked to look into Rompilla's mental state as of the time of the offense and his competency to stand trial. Id., at 473-474, 476, but their reports revealed `nothing useful' to Rompilla's case, id., at 1358, and the lawyers consequently did not go to any other historical source that might have cast light on Rompilla's mental condition.
 "When new counsel entered the case to raise Rompilla's postconviction claims, however, they identified a number of likely avenues the trial lawyers could fruitfully have followed in building a mitigation case. School records are one example, which trial counsel never examined in spite of the professed unfamiliarity of the several family members with Rompilla's childhood, and despite counsel's knowledge that Rompilla left school after the ninth grade. Id., at 677. Other examples are records of Rompilla's juvenile and adult incarcerations, which counsel did not consult, although they were aware of their client's criminal record. And while counsel knew from police reports provided in pretrial discovery that Rompilla had been drinking heavily at the time of his offense, Lodging to App. 111-120 (hereinafter Lodging), and although one of the mental health experts reported that Rompilla's troubles with alcohol merited further investigation, App. 723-724, counsel did not look for evidence of a history of dependence on alcohol that might have extenuating significance.
 "Before us, trial counsel and the Commonwealth respond to these unexplored possibilities by emphasizing this Court's recognition that the duty to investigate does not force defense lawyers to scour the globe on the off-chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste. See Wiggins v. Smith, 539 U.S., at 525, 123 S.Ct. 2527 (further investigation excusable where counsel has evidence suggesting it would be fruitless); Strickland v. Washington, supra, at 699, 104 S.Ct. 2052 (counsel could `reasonably surmise . . . that character and psychological evidence would be of little help'); Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (limited investigation reasonable because all witnesses brought to counsel's attention provided predominantly harmful information). The Commonwealth argues that the information trial counsel gathered from Rompilla and the other sources gave them sound reason to think it would have been pointless to spend time and money on the additional investigation espoused by postconviction counsel, and we can say that there is room for debate about trial counsel's obligation to follow at least some of those potential lines of enquiry. There is no need to say more, however, for a further point is clear and dispositive: the lawyers were deficient in failing to examine the court file on Rompilla's prior conviction.
 ". . . .
 "There is an obvious reason that the failure to examine Rompilla's prior conviction *Page 467 
file fell below the level of reasonable performance. Counsel knew that the Commonwealth intended to seek the death penalty by proving Rompilla had a significant history of felony convictions indicating the use or threat of violence, an aggravator under state law. Counsel further knew that the Commonwealth would attempt to establish this history by proving Rompilla's prior conviction for rape and assault, and would emphasize his violent character by introducing a transcript of the rape victim's testimony given in that earlier trial. App. 665-666. There is no question that defense counsel were on notice, since they acknowledge that a `plea letter,' written by one of them four days prior to trial, mentioned the prosecutor's plans. Ibid. It is also undisputed that the prior conviction file was a public document, readily available for the asking at the very courthouse where Rompilla was to be tried.
 "It is clear, however, that defense counsel did not look at any part of that file, including the transcript, until warned by the prosecution a second time. . . .
 "At the postconviction evidentiary hearing, Rompilla's lawyer confirmed that she had not seen the transcript before the hearing in which this exchange took place, id., at 506-507, and crucially, even after obtaining the transcript of the victim's testimony on the eve of the sentencing hearing, counsel apparently examined none of the other material in the file.
 "With every effort to view the facts as a defense lawyer would have done at the time, it is difficult to see how counsel could have failed to realize that without examining the readily available file they were seriously compromising their opportunity to respond to a case for aggravation. The prosecution was going to use the dramatic facts of a similar prior offense, and Rompilla's counsel had a duty to make all reasonable efforts to learn what they could about the offense. Reasonable efforts certainly included obtaining the Commonwealth's own readily available file on the prior conviction to learn what the Commonwealth knew about the crime, to discover any mitigating evidence the Commonwealth would downplay and to anticipate the details of the aggravating evidence the Commonwealth would emphasize. Without making reasonable efforts to review the file, defense counsel could have had no hope of knowing whether the prosecution was quoting selectively from the transcript, or whether there were circumstances extenuating the behavior described by the victim. The obligation to get the file was particularly pressing here owing to the similarity of the violent prior offense to the crime charged and Rompilla's sentencing strategy stressing residual doubt. Without making efforts to learn the details and rebut the relevance of the earlier crime, a convincing argument for residual doubt was certainly beyond any hope.
 ". . . .
 "At argument the most that Pennsylvania (and the United States as amicus) could say was that defense counsel's efforts to find mitigating evidence by other means excused them from looking at the prior conviction file. Tr. of Oral Arg. 37-39, 45-46. And that, of course, is the position taken by the state post-conviction courts. Without specifically discussing the prior case file, they too found that defense counsel's efforts were enough to free them from any obligation to enquire further. Commonwealth v. Rompilla, No. 682/1988 (Pa. Ct. Common Pleas, Aug. 23, 1996), App. 263-264, 272-273. *Page 468 
 "We think this conclusion of the state court fails to answer the considerations we have set out, to the point of being an objectively unreasonable conclusion. It flouts prudence to deny that a defense lawyer should try to look at a file he knows the prosecution will cull for aggravating evidence, let alone when the file is sitting in the trial courthouse, open for the asking. No reasonable lawyer would forgo examination of the file thinking he could do as well by asking the defendant or family relations whether they recalled anything helpful or damaging in the prior victim's testimony. Nor would a reasonable lawyer compare possible searches for school reports, juvenile records, and evidence of drinking habits to the opportunity to take a look at a file disclosing what the prosecutor knows and even plans to read from in his case. Questioning a few more family members and searching for old records can promise less than looking for a needle in a haystack, when a lawyer truly has reason to doubt there is any needle there. E.g., Strickland, 466 U.S., at 699, 104 S.Ct. 2052. But looking at a file the prosecution says it will use is a sure bet: whatever may be in that file is going to tell defense counsel something about what the prosecution can produce.
 "The dissent thinks this analysis creates a `rigid, per se' rule that requires defense counsel to do a complete review of the file on any prior conviction introduced, post, at 2475 (opinion of KENNEDY, J.), but that is a mistake. Counsel fell short here because they failed to make reasonable efforts to review the prior conviction file, despite knowing that the prosecution intended to introduce Rompilla's prior conviction not merely by entering a notice of conviction into evidence but by quoting damaging testimony of the rape victim in that case. The unreasonableness of attempting no more than they did was heightened by the easy availability of the file at the trial courthouse, and the great risk that testimony about a similar violent crime would hamstring counsel's chosen defense of residual doubt. It is owing to these circumstances that the state courts were objectively unreasonable in concluding that counsel could reasonably decline to make any effort to review the file. Other situations, where a defense lawyer is not charged with knowledge that the prosecutor intends to use a prior conviction in this way, might well warrant a different assessment.
 ". . . .
 "Since counsel's failure to look at the file fell below the line of reasonable practice, there is a further question about prejudice, that is, whether `there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' 466 U.S., at 694, 104 S.Ct. 2052. Because the state courts found the representation adequate, they never reached the issue of prejudice, App. 265, 272-273, and so we examine this element of the Strickland claim de novo, Wiggins v. Smith, supra, at 534, 123 S.Ct. 2527, and agree with the dissent in the Court of Appeals. We think Rompilla has shown beyond any doubt that counsel's lapse was prejudicial; Pennsylvania, indeed, does not even contest the claim of prejudice.
 "If the defense lawyers had looked in the file on Rompilla's prior conviction, it is uncontested they would have found a range of mitigation leads that no other source had opened up. In the same file with the transcript of the prior trial were the records of Rompilla's imprisonment on the earlier conviction, App. 508, 571, 631, which defense counsel testified *Page 469 
she had never seen, id., at 508. The prison files pictured Rompilla's childhood and mental health very differently from anything defense counsel had seen or heard. An evaluation by a corrections counselor states that Rompilla was `reared in the slum environment of Allentown, Pa. vicinity. He early came to the attention of juvenile authorities, quit school at 16, [and] started a series of incarcerations in and out Penna. often of assaultive nature and commonly related to over-indulgence in alcoholic beverages.' Lodging 40. The same file discloses test results that the defense's mental health experts would have viewed as pointing to schizophrenia and other disorders, and test scores showing a third grade level of cognition after nine years of schooling. Id., at 32-35.
 "The accumulated entries would have destroyed the benign conception of Rompilla's upbringing and mental capacity defense counsel had formed from talking with Rompilla himself and some of his family members, and from the reports of the mental health experts. With this information, counsel would have become skeptical of the impression given by the five family members and would unquestionably have gone further to build a mitigation case. Further effort would presumably have unearthed much of the material postconviction counsel found, including testimony from several members of Rompilla's family, whom trial counsel did not interview. Judge Sloviter summarized this evidence:
 "`Rompilla's parents were both severe alcoholics who drank constantly. His mother drank during her pregnancy with Rompilla, and he and his brothers eventually developed serious drinking problems. His father, who had a vicious temper, frequently beat Rompilla's mother, leaving her bruised and black-eyed, and bragged about his cheating on her. His parents fought violently, and on at least one occasion his mother stabbed his father. He was abused by his father who beat him when he was young with his hands, fists, leather straps, belts and sticks. All of the children lived in terror. There were no expressions of parental love, affection or approval. Instead, he was subjected to yelling and verbal abuse. His father locked Rompilla and his brother Richard in a small wire mesh dog pen that was filthy and excrement filled. He had an isolated background, and was not allowed to visit other children or to speak to anyone on the phone. They had no indoor plumbing in the house, he slept in the attic with no heat, and the children were not given clothes and attended school in rags.' 355 F.3d, at 279 (citations omitted) (dissenting opinion).
 "The jury never heard any of this and neither did the mental health experts who examined Rompilla before trial. While they found `nothing helpful to [Rompilla's] case,' Rompilla, 554 Pa., at 385, 721 A.2d, at 790, their postconviction counterparts, alerted by information from school, medical, and prison records that trial counsel never saw, found plenty of `"red flags"' pointing up a need to test further. 355 F.3d, at 279 (Sloviter, J., dissenting). When they tested, they found that Rompilla `suffers from organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions.' Ibid.
They also said that `Rompilla's problems relate back to his childhood, and were likely caused by fetal alcohol syndrome [and that] Rompilla's capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially *Page 470 
impaired at the time of the offense.' Id., at 280 (Sloviter, J., dissenting).
 "These findings in turn would probably have prompted a look at school and juvenile records, all of them easy to get, showing, for example, that when Rompilla was 16 his mother `was missing from home frequently for a period of one or several weeks at a time.' Lodging 44. The same report noted that his mother `has been reported . . . frequently under the influence of alcoholic beverages, with the result that the children have always been poorly kept and on the filthy side which was also the condition of the home at all times.' Ibid. School records showed Rompilla's IQ was in the mentally retarded range. Id., at 11, 13, 15.
 "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered `mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of [Rompilla's] culpability,' Wiggins, 539 U.S., at 538, 123 S.Ct. 2527 (quoting Williams v. Taylor, 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is `sufficient to undermine confidence in the outcome' actually reached at sentencing, Strickland, 466 U.S., at 694, 104 S.Ct. 2052.
 "The judgment of the Third Circuit is reversed, and Pennsylvania must either retry the case on penalty or stipulate to a life sentence."
(Footnotes omitted.)
In light of these decisions and the appellant's challenges to the validity of his waiver and counsel's performance in relation to that waiver, it is not appropriate to rely solely on the appellant's waiver to justify counsel's performance. SeeWiggins, 539 U.S. at 526-27, 123 S.Ct. at 2538 (noting that "the `strategic decision' the state courts and respondents all invoke to justify counsel's limited pursuit of mitigating evidence resembles more a post hoc rationalization of counsel's conduct than an accurate description of their deliberations prior to sentencing"). Rather, an examination of the investigation counsel conducted is critical to determining the validity of the appellant's waiver and the effectiveness of counsel's performance in relation thereto.
In this regard, we note that
 "[t]he United States Court of Appeals for the Eleventh Circuit has held that trial counsel's failure to investigate the possibility of mitigating evidence is, per se, deficient performance. See Horton v. Zant, 941 F.2d 1449, 1462 (11th Cir.1991) (`our case law rejects the notion that a "strategic" decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them'), cert. denied, 503 U.S. 952, 112 S.Ct. 1516, 117 L.Ed.2d 652 (1992); see, also, Jackson v. Herring, 42 F.3d 1350, 1366-68 (11th Cir.) (`Although counsel need not "investigate every evidentiary lead," he must gather enough knowledge of the potential mitigation evidence to arrive at an "informed judgment" in making [the decision not to present such evidence]. . . . [A] legal decision to forgo a mitigation presentation cannot be reasonable if it is unsupported by sufficient investigation.') (emphasis added; citations omitted), cert. dismissed, 515 U.S. 1189, 116 S.Ct. 38, 132 L.Ed.2d 919 (1995). Furthermore, trial counsel may be found ineffective for failing to present evidence of adjustment to incarceration, evidence of mental-health problems, and evidence *Page 471 
regarding the defendant's contact with a juvenile system. See Skipper v. South Carolina, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (holding that a capital defendant must be permitted at the penalty phase of his trial to introduce evidence of adjustment and good behavior while incarcerated); Horton v. Zant, supra (counsel found ineffective for not presenting evidence of adjustment to incarceration); Blanco v. Singletary, 943 F.2d 1477 (11th Cir.1991), cert. denied, 504 U.S. 943, 112 S.Ct. 2282, 119 L.Ed.2d 207 (1992) (counsel found ineffective for failing to introduce evidence that defendant had mental-health problems and a very low IQ and had suffered from various bouts of paranoia and depression); Porter v. Wainwright, [805 F.2d 930 (11th Cir.1986)] (holding that juvenile records may be evidence of mitigating circumstances and that trial counsel's failure to present such records may constitute ineffective assistance of counsel); see, also, Williams v. Turpin, 87 F.3d 1204 (11th Cir.1996) (failure to investigate and present juvenile records may constitute ineffective assistance of counsel, depending on the content of such records and a showing of prejudice)."
Ex parte Land, 775 So.2d 847, 853-54 (Ala. 2000). Also, "defendant resistance to disclosure of information does not excuse counsel's duty to independently investigate."Coleman v. Mitchell, 268 F.3d 417, 449-50 (6th Cir.2001). As the United States Supreme Court explained inWiggins, 539 U.S. at 521-22, 123 S.Ct. at 2535:
 "In this case, as in Strickland, petitioner's claim stems from counsel's decision to limit the scope of their investigation into potential mitigating evidence. Id., at 673, 104 S.Ct. 2052. Here, as in Strickland, counsel attempt to justify their limited investigation as reflecting a tactical judgment not to present mitigating evidence at sentencing and to pursue an alternative strategy instead. In rejecting the respondent's claim, we defined the deference owed such strategic judgments in terms of the adequacy of the investigations supporting those judgments:
 "`[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' [Strickland v. Washington, 466 U.S.] at 690-691, 104 S.Ct. 2052."
Thus, "a strategic decision that is based on an incomplete investigation may not be strategic or reasonable."Harris, 947 So.2d at 1119. See also King v.Bell, 392 F.Supp.2d 964, 984 (M.D.Tenn.2005) (noting that "[f]ailure to investigate and prepare for a death penalty sentencing hearing cannot qualify as a reasonable, strategic decision of counsel when no investigation at all was done").
In this case, by relying solely on the appellant's waiver to reject his penalty-phase ineffective-assistance-of-counsel allegations, the circuit court presupposed the validity of the waiver and the effectiveness of counsel in relation to that waiver. However, the record before us does not establish what penalty-phase investigation, if *Page 472 
any, trial counsel conducted; details regarding counsel's performance in relation to the waiver; and the precise scope of the waiver. Therefore, the circuit court erred in assuming that the waiver was valid and in relying solely on that waiver to reject the appellant's allegations. Compare Lamarca v.State, 931 So.2d 838, 850 (Fla. 2006) (upholding a mitigation waiver where the defendant represented himself during the penalty phase and chose not to present any mitigating evidence; where the record was "`replete with references to [the defendant's] decisions to waive mitigation'" and showed that penalty phase counsel started preparing for the penalty phase months before the trial began; and where the trial court required penalty phase counsel to make a statement as to the mitigating evidence that could have been presented on the defendant's behalf and required the defendant to confirm counsel's statement that he did not wish to present mitigation).[5] Accordingly, we must remand this case to the circuit court for that court to address the appellant's allegations concerning the validity of his waiver and the effectiveness of his counsel in relation thereto in light of the principles set forth in this opinion.
 III.
Finally, the appellant argues that the circuit court improperly denied his discovery requests. In his motions for production of records and of district attorney and *Page 473 
sheriff files, records, and information and during a status conference, he alleged that the discovery was necessary to develop his ineffective-assistance-of-counsel claims. When it denied the discovery requests, the circuit court stated that the requested information pertained only to his contentions that counsel rendered ineffective assistance by not presenting mitigating evidence during the penalty phase of his trial; that the appellant had waived his right to present mitigating evidence; that, as a matter of law, his trial counsel could not have rendered ineffective assistance; and that, therefore, he was not entitled to the requested discovery. On remand, in light of our discussion in Part II of this opinion, the circuit court may wish to reconsider its rulings on the above-referenced discovery motions. See Ex parte Land, 775 So.2d 847
(Ala. 2000); State v. Stallworth, 941 So.2d 327
(Ala.Crim.App. 2006); Ex parte Perkins, 920 So.2d 599
(Ala.Crim.App. 2005); Hooks v. State, 822 So.2d 476
(Ala.Crim.App. 2000).
For the above-stated reasons, we reverse the circuit court's judgment and remand this case to that court for proceedings that are consistent with this opinion.[6]
REVERSED AND REMANDED.
McMILLAN, P.J., and COBB, SHAW, and WISE, JJ., concur.
[1] The State argues that the circuit court made the alternative finding that the appellant did not set forth each of these allegations with the required specificity. At first blush, this argument appears to be correct. Upon further review of the circuit court's order, however, we conclude that the circuit court's findings regarding the specificity of the pleadings are inextricably entwined with its conclusion that a finding of no plain error on direct appeal foreclosed a finding ofStrickland prejudice in a Rule 32 ineffective-assistance-of-counsel claim.
[2] By remanding this case, we do not in any way mean to imply that the appellant has satisfied his burden of pleading pursuant to Rules 32.3 and 32.6(b), Ala. R.Crim. P. Rather, we simply intend for the circuit court to apply the proper standard in reviewing the allegations. On remand, if the circuit court determines that the appellant has sufficiently pled any of the allegations, it may conduct further proceedings in accordance with Rule 32.9, Ala. R.Crim. P.
[3] Other state courts have established guidelines for trial courts to follow when a defendant waives the presentation of mitigating evidence.
In Wallace v. State, 893 P.2d 504, 512-13
(Okla.Crim.App. 1995), the Oklahoma Court of Criminal Appeals held:
 "These guidelines must be used . . . in a trial when a defendant refuses to allow the presentation of mitigating evidence in the sentencing stage.
 ". . . [T]he court must ensure the defendant has an understanding of his or her rights both in the plea process and in the sentencing process:
 "(1) The court must inform the defendant of the right to present mitigating evidence, and what mitigating evidence is.
 "(2) The court must inquire both of the defendant and his attorney (if not pro se) whether he or she understands these rights.
 "(3) The court should also inquire of the attorney if he or she has attempted to determine from the defendant whether there exists any evidence which could be used to mitigate the aggravating circumstances proven beyond a reasonable doubt by the prosecution.
 "(4) If such information has been given, the attorney must advise the court what that mitigating evidence is; if the defendant has refused to cooperate, the attorney must relate that to the court.
 "(5) The trial court must inquire of a defendant and make a determination on the record whether the defendant understands the importance of mitigating evidence in a capital sentencing scheme, understands such evidence could be used to offset the aggravating circumstances proven by the prosecution in support of the death penalty, and the effect of failing to present that evidence.
 "(6) After being assured the defendant understands these concepts, the court must inquire of the defendant whether he or she desires to waive the right to present such mitigating evidence.
 "(7) Finally, the court should make findings of fact pursuant to Grasso [v. State, 857 P.2d 802
(Okla.Crim.App. 1993),] of the defendant's understanding and waiver of rights.
 "By using these guidelines, trial courts can provide valuable information and help preserve the record for the mandatory sentence review."
In Koon v. Dugger, 619 So.2d 246, 250 (Fla. 1993), the Florida Supreme Court held:
 "When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what that evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence."
[4] We have taken judicial notice of the record from the appellant's direct appeal. See Nettles v. State,731 So.2d 626 (Ala.Crim.App. 1998).
[5] We recognize that some courts have declined to require counsel to conduct a mitigation investigation if the defendant knowingly, voluntarily, and intelligently waives such an investigation. See, e.g., Commonwealth v. Wilson,580 Pa. 439, 861 A.2d 919 (2004), and Zagorski v. State,983 S.W.2d 654 (Tenn. 1998). To protect the rights of such defendants, those courts have established guidelines for assuring that a defendant makes a knowing, voluntary, and intelligent waiver. In Wilson, 861 A.2d at 934-35 n. 20, the Pennsylvania Supreme Court held:
 "Given the consequences of a defendant's decision waiving the introduction of mitigating evidence, a trial court should conduct an on-the-record colloquy informing him of the right to present such proof, its importance, and, after ensuring that he understands its importance and the risks associated with a waiver, whether he wishes to forego the presentation of mitigating evidence."
In Zagorski, 983 S.W.2d at 660-61, the Tennessee Supreme Court held:
 "In prospective cases, when a defendant, against his counsel's advise [sic], refuses to permit the investigation and presentation of mitigating evidence, counsel must inform the trial court of these circumstances on the record, outside the presence of the jury. The trial court must then take the following steps to protect the defendant's interests and to preserve a complete record:
 "1. Inform the defendant of his right to present mitigating evidence and make a determination on the record whether the defendant understands this right and the importance of presenting mitigating evidence in both the guilt phase and sentencing phase of trial;
 "2. Inquire of both the defendant and counsel whether they have discussed the importance of mitigating evidence, the risks of foregoing the use of such evidence, and the possibility that such evidence could be used to offset aggravating circumstances; and
 "3 . After being assured the defendant understands the importance of mitigation, inquire of the defendant whether he or she desires to forego the presentation of mitigating evidence.
 "This procedure will insure that the accused has intelligently and voluntarily made a decision to forego mitigating evidence. Trial judges, however, shall not inquire of counsel as to the content of any known mitigating evidence. To hold otherwise would potentially force counsel to act against the client's wishes and would risk the disclosure of privileged or confidential information."
(Footnote omitted.) In light of the United States Supreme Court's decisions in Rompilla and Wiggins, we question the continued validity of such decisions.
[6] Because of our disposition of the arguments addressed in this opinion, we pretermit discussion of the remaining arguments the appellant raises in his brief to this court.